UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DEMETRIUS M. BOYD,

      Plaintiff,

v.                                            Case No. 12-C-0803

WILLIAM POLLARD, CAPTAIN DONALD STRAHOTA,
JOSEPH BEAHM, and DAN BRAEMER,

      Defendants.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (DOC. 28), DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT (DOC. 34), AND DISMISSING THIS ACTION

Plaintiff, a pro se Wisconsin state prisoner, claims that Joseph Beahm used excessive force against him in violation of the Eighth Amendment and that William Pollard, Donald Strahota, and Dan Braemer subjected him to unconstitutional conditions of confinement. The parties have filed cross-motions for summary judgment that are addressed below.

## I. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## II. FACTS[1]

Plaintiff commenced this lawsuit asserting a cause of action pursuant to 42 U.S.C. § 1983 against employees of Waupun Correctional Institution (WCI). He was allowed to proceed on his claim that Joseph Beahm used excessive force against him during a cell extraction performed on April 1, 2011. Plaintiff was also allowed to proceed on a claim that William Pollard, Donald Strahota, and Dan Braemer failed to respond to his notifications that his cell conditions were poor.

Beahm has been employed by the Wisconsin Department of Corrections (DOC) as a correctional officer at WCI since 2005. Pollard was the warden of WCI at all times

---

[1] Relevant facts are taken from Defendants' Proposed Findings of Fact filed in support of their motion for summary judgment and Plaintiff's Proposed Findings of Fact filed in support of his motion for summary judgment. Facts are undisputed unless otherwise indicated. Plaintiff's proposed facts do not cite to the record. However, the document is sworn and the court therefore construes it as an affidavit for the purposes of summary judgment. *See Ford v. Wilson*, 90 F.3d 245, 246 (7th Cir. 1996).
  Plaintiff submitted a document titled Plaintiff's Response to Defendants' Proposed Findings of Fact. (Docket 44.) However, the responses contained therein do not correspond to defendants' proposed findings of fact. In addition, plaintiff's responses do not cite to the record. Thus, the court did not consider the filing in this section. *See* Fed. R. Civ. P. 56(c)(1).

2

relevant; Strahota was the security director or deputy warden of WCI; and Braemer was a captain in charge of the segregation unit at WCI. Lieutenant Brian Greff, who is not a defendant, was employed as a lieutenant at WCI at all times relevant. He was on duty on April 1, 2011, and personally supervised the cell extraction team that was mobilized to respond to plaintiff's behavior.

A.   Excessive Force Claim

On April 1, 2011, at 12:30 p.m., Lieutenant Greff was called to the segregation building in response to plaintiff's behavior. Earlier that day, plaintiff held his medications and threatened staff members. Other inmates near plaintiff's cell were riled up, yelling at staff and banging on their cell doors. As a result, staff decided that plaintiff should be moved to the A-range wing in segregation.

Lieutenant Greff went to plaintiff's cell front and informed him he was going to be moved to A-range due to his behavior. Plaintiff replied "Do what you gotta do." (Greff Aff. ¶ 5.) Lieutenant Greff directed plaintiff to place his hands out of the trap of his cell door to be restrained so he could be escorted to his new cell. After plaintiff refused to place his hands through the trap, Lieutenant Greff gathered staff members to form a pad subduing team composed of several officers equipped with safety equipment such as knee pads, elbow pads, stab proof vests, and helmets. This equipment aids in subduing a violent or potentially dangerous inmate, while minimizing the chances of injury to the inmate and the officers.

Staff members of the team that Lieutenant Greff assembled included Beahm, in position as "Pad 1," Michael Vanderbush, in position as "Pad 2," Ryan Flejter, as team

3

leader, Arnold Carlson, in charge of restraints, and Timothy Bori, operating the camera which recorded the incident. Each pad subduing team member has a job as follows:

    a. Pad 1 (first position) is positioned directly outside the cell and has an ASP pad (a soft pad used to provide a barrier between the inmate and staff member if entry into the cell is necessary). Pad 1's initial responsibilities begin with securing the arm of the inmate so the restraints can be applied. After the restraints are applied and the cell door is open he/she is responsible for securing the arm and escorting the inmate to the next destination. If entry into the cell is necessary Pad 1 is the first to enter the cell and the first to make physical contact with the inmate. The ASP pad is utilized in an attempt to control the inmate so restraints can be applied.

    b. Pad 2 (second position) also has an ASP pad and is responsible for the other side of the inmate's body and arms, controlling them until the inmate can be handcuffed, and assists in handcuffing and escorting. If entry into the cell is necessary the Pad 2 officer is directly behind Pad 1 and secures the opposite side that Pad 1 secured.

    c. The team leader (third position) is responsible for verbalizing what is happening during the incident. The team leader is the only staff member who should be providing direction to the inmate ensuring clear expectations for the inmate. The team leader instructs the inmate on what is going to happen next and the team ensures the directives are carried out. The team leader is the third person in line on a pad subduing team and gives the final directive before the security supervisor authorizes use of force. If entry into the cell is necessary the team leader provides verbal direction to the inmate and assists the team in securing the inmate.

    d. Restraint officer (fourth position) is responsible for carrying all potential restraints and keys necessary for the incident. This officer is also responsible for the application of the restraints and double locking them.

(Greff Aff. ¶ 9.) Although positions are assigned to each staff member, it is common for these roles and positions to shift as necessary according to the specific needs of a given situation. In this incident, a forced cell entry and extraction were not ultimately performed, as the team was able to remove plaintiff from his cell without storming in and forcing him out. Team members adjusted roles as necessary to subdue plaintiff and escort him to his cell.

Once the team was assembled and in their safety gear, Officer Bori began recording the cell extraction. (*See* Greff Aff. ¶ 11, Exh. A.) After introducing the team, Lieutenant Greff led them to plaintiff's cell. As seen on the video, Lieutenant Greff directed plaintiff to place his hands through the trap to be restrained. Plaintiff responded that he would comply. Staff opened the trap and plaintiff then refused to place his hands through the trap. Officer Flejter directed plaintiff to place his hands completely through the trap. After several directives, plaintiff placed his right hand through the trap at which time a tether strap and a wrist restraint were applied. Officer Flejter asked plaintiff if he had anything he wanted to say and plaintiff stated, "Yes, all you'll are a bunch of racist ass punk-muthafucking crackers." (Pl.'s Proposed Fact 2, Docket 34 at 2.)

Beahm is seen on the video on the far left. He held onto plaintiff's right hand to maintain control. Officer Vanderbush is seen on the right, waiting to take control of plaintiff's left hand, whereas Officer Carlson is in the middle, waiting to apply restraints.

At that time, plaintiff forcefully attempted to pull Beahm's hands into his cell. Beahm used a compliance hold to secure plaintiff's hands so the mechanical restraints could be fully secured to both wrists and double locked. During the attempt to pull Beahm's hands into plaintiff's cell, Beahm's hand was caught on the top of the trap. Despite several direct orders as heard on the video, plaintiff refused to place his left arm through the trap. He became resistive, grabbed at staff and tried to pull his arm back into his cell. As plaintiff pulled his right arm back through the trap, Beahm's hands were pulled into the trap. After several directives, staff were able to get both of plaintiff's hands secured and in wrist restraints.

5

Due to the behavior of plaintiff, Lieutenant Greff called for an Ultron II device to subdue plaintiff if necessary. An Ultron II is a device designed to stun or temporarily immobilize an inmate by delivering an electric shock. The video shows the pad subduing team waiting for the Ultron II to arrive. When it did, Lieutenant Greff is seen informing plaintiff that he had the Ultron II in his possession demonstrating that the device was working then directing that the cell door be opened. However, the Ultron II was not used during this incident.

The cell door was opened and the team surrounded plaintiff to restrain him. Beahm entered the cell and was on plaintiff's left arm, Officer Vanderbush was on plaintiff's right arm, and Officer Carlson was behind plaintiff to apply restraints. As seen and heard in the video, plaintiff was instructed to kneel so that leg restraints could be applied. Initially he refused to kneel. After several directives, and after Lieutenant Greff placed the Ultron II near plaintiff's back, he did slowly kneel down so that leg restraints could be applied. Staff assisted plaintiff back to his feet and Officer Carlson applied a waist belt.

At that time staff had all restraints applied appropriately and Lieutenant Greff removed the electronic device. The video shows plaintiff turning his head and spitting directly into Lieutenant Greff's face. As a supervisor, Greff did not come in the same degree of physical contact with plaintiff as the staff wearing the safety equipment. The supervisor's role is to provide overall direction to the pad subduing team ensuring their safety and to ensure the inmate is provided the necessary medical and clinical services as needed. After plaintiff spit on him, Lieutenant Greff notes saliva on his forehead, cheeks, and mouth and saliva can be observed on his glasses. At this point Lieutenant Greff is seen turning to the camera and stating that he had just been spat on. Staff then secured

6

Case 2:12-cv-00803-CNC   Filed 03/07/14   Page 6 of 18   Document 49

plaintiff's head and directed him to the floor in a secured descent. While inside of the cell, plaintiff was laughing and smiling, stating, "I just spit on the lieutenant. Ha ha, you're next Beahm." Plaintiff then attempted to spit on Beahm, but the saliva fell short and landed on the floor of the cell.

After plaintiff calmed down, he was assisted to his feet and escorted to the A-range section of the building. To prevent him from spitting at staff again, Beahm used a compliance hold, thereby placing one hand under plaintiff's chin and the other hand on top of plaintiff's head. As a result, plaintiff was unable to open his mouth or turn his head. At this point, plaintiff was extremely disrespectful and threatening to staff. He implied that he would kill a staff member and that if he could not do it, someone else would.

When the team entered the A-range, they began to escort plaintiff down the stairs. However, the team was informed that the upper level control cell should be used. The team then stopped and backed up the stairs. Plaintiff was walked backwards up the stairs because the compliance hold is more comfortable to an inmate's head when it is controlled from above.

What happened next is unclear. According to plaintiff, after defendants entered the upper A-range area, Beahm body-slammed him to the concrete floor without warning. (Pl.'s Proposed Fact 5, Docket 34 at 2.) Defendants maintain that when reaching the upper A-range door, plaintiff became physically resistive after and attempted to pull away from staff. It was then that staff directed plaintiff to the floor.

Staff assisted plaintiff to his feet after regaining control of his arms and legs and then continued to escort him to his new cell. Plaintiff continued to verbally disrespect staff by calling them "bitches" and "honkeys" and making threats.

7

When the team and plaintiff arrived at the new cell, A226, plaintiff became resistive and accused staff of spitting on him. Plaintiff's clothes were then cut off of him using Dura Shears. This standard procedure facilitates a strip search for weapons and contraband prior to placement of a prisoner in control status. Plaintiff's pants were cut off while he was kneeling. Next he was assisted to his feet so that his shirt could be cut off.

After plaintiff's clothes were removed, a staff member noted that plaintiff had a wound over his right eye. The video shows that Nurse Ann Tabb came to the cell door and provided medical attention to plaintiff.

It is unclear what happened next. According to defendants, as staff members attempted to put a spit mask on plaintiff's face, so that he could be treated by the nurse, plaintiff again became resistive. In response to plaintiff's sudden assaultive movements, he was directed to the wall and then to the floor.

The video shows Beahm was securing plaintiff's head using a compliance hold with his right hand under plaintiff's chin. Beahm's right thumb was near plaintiff's mouth. As the team attempted to place a spit mask over plaintiff's face, plaintiff attempted to bite Beahm's right thumb. Plaintiff then used his right elbow to strike Officer Flejter in the abdomen. Beahm then used a vertical wall stun to control plaintiff. This involved Beahm forcefully pressing plaintiff against the wall to control him in accordance with training techniques. Plaintiff, on the other hand, avers that the next "attack seem[ed] to be happening at once." (Pl.'s Proposed Fact 8, Docket 34 at 3.) He goes on to state, "I remember feeling blows to my face and head area[;] my survival skills must have kicked in to full effect because I went black and the next thing I recall was hearing Lt. Greff yelling orders at the defendants to

8

pick me up[;] that's when I noticed I was laying on the floor with blood coming down my face." *Id.*

After the team regained control, plaintiff was assisted to his feet. A spit mask was applied and photos were taken of his head. Plaintiff's injuries are assessed by Nurse Tabb. She is seen on the video leaving to retrieve materials to clean plaintiff's face. While nurse Tabb is away, there are several minutes with no activity as the team waits for Nurse Tabb.

When Nurse Tabb returned, she stated that plaintiff would need to be seen in the examination room. Afterward, plaintiff was assisted to his knees and his leg restraints were reapplied. At this point, plaintiff went limp. As staff assisted him to his feet, plaintiff made sudden jerking movements.

A towel was wrapped around plaintiff's waist and he was escorted to the examination room where his wound received further medical attention. The compliance hold was not being used at this time. While he was examined, plaintiff made statements implying that he did not remember how he got into the exam room. Nurses Tabb and Donna Larson provided medical treatment and Nurse Tabb stated that she was medically satisfied that plaintiff could be placed in his cell. While the nurses were checking him over, plaintiff added "How did I get down here? I don't remember anything." The nurses gave plaintiff a full assessment, then he was escorted back to his new cell.

Plaintiff remarked that he felt suicidal. Consequently, the Psychology Services Unit (PSU) staff were called to see him. Afterward, plaintiff was placed in his cell in control status without any property in light of his extreme agitation and the amount of physical resistance he provided earlier that day. Anna Garcia, a clinician from PSU, spoke with

9

plaintiff at his cell. When Ms. Garcia arrived, Lieutenant Greff led the team away from the range and conducted a wrap-up for the video.

No staff injuries were reported initially. However, staff members reported injuries from plaintiff after the incident. Lieutenant Greff was seen at the hospital for exposure tests due to plaintiff's spitting in his face. Officer Vanderbush had discoloring on his right hand; Officer Flejter had pain in his abdomen; and Beahm's right hand was swollen and sore.

Plaintiff also sustained injuries from the incident. His eye lids were black, his head was slightly swollen around the temples, and he had a cut over the right eye lid that was glued shut. Both of plaintiff's wrists were swollen and exhibited cuts from the hand-cuffs. Knots were visible on the left side of his head under his hair.

Plaintiff takes Meloxicam for pain although the medication does not relieve the pain. Bright light causes right eye pain that leads to headaches. (Pl.'s Proposed Fact 18, Docket 34 at 5.)

On April 3, 2011, Lieutenant Greff completed Adult Conduct Report #2150441, which charged plaintiff with battery, threats, disobeying orders, and disrespect arising from the incident on April 1, 2011. (Greff Aff. ¶ 38, Ex. B.) Adult conduct reports are issued by officers in the DOC when inmates violate rules. The conduct report reflects the rules were violated, a description of the violation, and any disposition imposed. After a conduct report is filed, it is reviewed by the security director within two days for appropriateness. If it is not dismissed, the conduct report is filed with the inmate's records. Plaintiff's disciplinary hearing was held on April 11, 2011, and he was found guilty of the four offenses.

On April 4, 2011, Lieutenant Greff completed an incident report regarding the events involving plaintiff on April 1, 2011. (Greff Aff. ¶ 40, Ex. C.) Beahm also completed an incident report. (Beahm Aff. ¶ 3, Ex. A.)

B.   Conditions of Confinement Claim

Welcome Rose is employed by the DOC as a Corrections Complaint Examiner (CCE). In this capacity, she receives and investigates appeals made to the DOC Secretary regarding adverse decisions on complaints filed by inmates, and makes appropriate recommendations concerning the same.

The DOC maintains an Inmate Complaint Review System (ICRS) in Wisconsin adult correctional facilities. The purpose of the ICRS is to afford inmates in adult institutions a process by which grievances may be expeditiously raised, investigated, and decided. *See* Chapter 310, Wis. Admin. Code. Consistent with § DOC 310.05, Wis. Admin. Code, inmates must exhaust all administrative remedies that the DOC has promulgated by rule before they may commence a civil action or special proceeding against an officer, employee, or agent of the DOC in that person's official or individual capacity.

An inmate begins the ICRS complaint process by filing a complaint with the institution complaint examiner at his or her institution, consistent with the provisions of DOC 310.09. The institution complaint examiner reviews and investigates the inmate complaint at the institution level, within the parameters set forth in DOC 310.11, Wis. Admin. Code. The institution complaint examiner makes a recommendation on the complaint to the appropriate reviewing authority, which is the warden, bureau director, administrator, or designee who is authorized to review and decide an inmate complaint at the institution level.

If an adverse decision on an ICRS offender complaint has been made by the appropriate reviewing authority under § DOC 310.12, Wis. Admin. Code, the inmate may appeal the institution level decision by filing a written request for review with Rose's office pursuant to §§ DOC 310.07 (4), (6) and (7) and § DOC 310.13, Wis. Admin. Code. Some inmate complaints are rejected at the institution level, pursuant to Wis. Admin. Code § DOC 310.11(5) for particular reasons specified in that part of the Code. To exhaust his administrative remedy, an inmate must complete the appeal process through Rose's office, which results in a decision by the Office of the Secretary, as set forth in DOC Admin Code §310.07(7) and 310.14.

In her capacity as CCE, Rose has diligently searched and examined the regularly conducted business records of her office, specifically with respect to inmate complaints and appeals filed by plaintiff. (Rose Aff. ¶¶ 10-11, Ex. A.) During the course of her search, based upon the inmate complaint history examined, she found no offender complaints related to plaintiff's claims regarding conditions of his confinement on or about April 1, 2011.

### III. ANALYSIS

Defendants contend that the evidence in this case clearly establishes that Beahm did not use excessive force against plaintiff. They further contend that plaintiff's conditions of confinement claim is barred due to his failure to exhaust his administrative remedies prior to raising it in this lawsuit. Plaintiff disagrees and contends that he is entitled to summary judgment on Eighth Amendment claims that he was subject to cruel conditions of confinement and excessive use of force.

A.   Excessive Force Claim

The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits "unnecessary and wanton infliction of pain" on prisoners. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). In cases involving the use of excessive force, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson*, 503 U.S. at 7). Factors in determining whether the use of force was wanton and unnecessary include "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

Often circumstances require prison officials to balance the need "to maintain or restore discipline" using force at the risk of injury to inmates. *Hudson*, 503 U.S. at 6. Both situations require officials to act quickly and decisively. *Id.* Likewise, both implicate the principle that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (internal citations and quotations omitted).

> It is well-established that prisoners must follow orders.
>
> Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them . . . . Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

*Lewis v. Downey*, 581 F.3d 467, 476-77 (7th Cir. 2009) (quoting *Soto v. Dickey*, 744 F.2d 1260, 1266-67 (7th Cir. 1984)). "When an order is given to an inmate there are only so

13

many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force." *Soto*, 744 F.2d at 1267.

Here, the facts demonstrate that Beahm used force against plaintiff in a good-faith effort to maintain or restore discipline. The record shows that plaintiff repeatedly failed to follow the orders of the correctional staff and was disruptive during most of the incident of April 1, 2011. Correctional staff slowly escalated their efforts to force plaintiff to comply with their directives and, to some extent, their efforts worked. For example, plaintiff eventually complied with orders to place his hands through his cell trap for hand-cuffing thereby obviating the need for the cell entry team to enter the cell by force. In addition, after being threatened with the Ultron II, plaintiff complied with directives to kneel so that officers could place leg restraints on him. The Ultron II was never used.

Despite these instances of compliance, plaintiff continued to disobey orders and engage in verbally and physically assaultive behavior. Not long after plaintiff complied with the order to kneel so that leg restraints could be placed on him, he was assisted to a standing position and proceeded to spit on to Lieutenant Greff's face. Plaintiff's resistant behavior was sporadic during the incident as he seized certain opportunities for non-compliant behavior. Nevertheless, the officers exercised restraint despite plaintiff's physical and verbal resistance.

Plaintiff avers that excessive force was used against him on two instances. First, plaintiff submits that Beahm body-slammed him to the concrete floor without warning after team members entered the upper A-range area. Second, plaintiff avers that, after he arrived

at cell A226 and his clothes were removed, he realized that he was being attacked and received repeated blows to his head, that caused him to black out. These two instances are disputed by Beahm. *See supra.* at 8-9.

While such a factual dispute might preclude summary judgment in favor of either party, here the DVD of the incident provides uncontroverted evidence. The DVD does not substantiate plaintiff's averments about Beahm's behavior. Specifically, there is no evidence that Beahm slammed plaintiff's body or head into the floor or wall. Plaintiff does not dispute that he tried to bite Beahm, who can be seen pressing plaintiff toward the wall when plaintiff resisted placement of the spit mask. Moreover, there is nothing in the DVD to suggest that Beahms' actions were anything more than attempts to control a volatile situation and obtain plaintiff's compliance.

Where video evidence contradicts the plaintiff's version of events, the court should not accept the plaintiff's story for purposes of summary judgment. *Scott v. Harris*, 550 U.S. 372, 378-80 (2007); *cf. Bogie v. Rosenberg*, 705 F.3d 603, 610-12 (7th Cir. 2013) (dismissal of complaint was appropriate where video exhibit attached to complaint contradicted the allegations in the complaint); *see also Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004) (upholding a district court's decision to reject an assertion that prison guards struck an inmate's groin when a video recording of the interactions, thought not capturing "every second of every aspect," is "fairly comprehensive" and refutes the claim).

On this record, no reasonable jury could conclude that Beahm used excessive force against plaintiff.

B.     Conditions of Confinement Claim

15

The Prison Litigation Reform Act (PLRA) provides in pertinent part that, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is a condition precedent to suit. *Dixon v. Page*, 291 F.3d 485, 488 (7th Cir. 2002) (citing *Perez v. Wis. Dep't of Corrs.*, 182 F.3d 532, 535 (7th Cir. 1999)). Section 1997e applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The PLRA exhaustion requirement requires "proper exhaustion," meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines. *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006); *see also Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require"). Exhaustion is an affirmative defense, and the burden of proof is on the defendants. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (citing *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004)).

The undisputed facts establish that plaintiff did not file an offender complaint related to his conditions of confinement claim. Although not entirely clear, plaintiff appears to argue that the three offender complaints he filed regarding his disciplinary hearing – WCI-2011-9720, WCI-2011-9721, and WCI-2011-7636 – should be considered as having exhausted his conditions of confinement claim. Plaintiff did not submit the actual offender complaints for any the three grievances in response to defendants' motion for summary judgment. He did, however, file the ICE Rejection forms for WCI-2011-7636 and WCI-2011-9721, which

demonstrate that the inmate complaints were rejected. The forms are insightful as to the content of the grievances. (Docket 37 at 3-4.)

The ICE Rejection for WCI-2011-7636 states that the subject of the complaint was discipline and that plaintiff had issues with Conduct Report 2150441. The rejection comment provides the following additional information:

> Per DOC 310.08(2)(a), Wis. Adm. Code, the scope of the ICRS excludes complaints regarding any issue related to a conduct report "that has not been resolved through the disciplinary process in accordance with ch. DOC 303." Conduct report #2150441 has not been resolved through the disciplinary process as there is no indication of an appeal filed to the Warden. Consequently, the complaint falls from the scope of the ICRS and is rejected on that basis.
>
> Inmate Boyd is reminded that the ICRS may be used to challenge only the procedure used in the disciplinary process, following DOC 310.08(3). In accordance with DOC 210.11(3), the investigation of a complaint filed under DOC 310.08(3) is limited to review of the record.

(Docket 37 at 3.) Likewise, the ICE Rejection for WCI-2011-9721 states that the subject of the grievance was discipline and that plaintiff had issues with Conduct Report 2150441. The rejection comment adds:

> In accordance with DOC 310.11(3), the investigation of a complaint filed under DOC 310.08(3) is limited to review of the record. In addition, the ICRS may be used to challenge only the procedure used in the disciplinary process. Arbitrary issues, matters involving acts of discretion on the part of the adjustment committee such as the weight and credibility given to evidence and testimony, or discretionary acts on the part of the Security Director or Warden, and elements outside of the official hearing record can not be addressed. In addition, inmate Boyd should be aware that the Warden's decision regarding the sufficiency of evidence is final. DOC 303.76(7)(d).
>
> Review of the complaint reveals inmate Boyd's wish to appeal conduct report #2150441 is based on his belief procedural errors occurred, however, he raises no specific procedural error in his complaint.
>
> As mentioned above, only challenges to the procedure used in the disciplinary process are within the scope of the ICRS. Absent such a challenge, the

17

complaint falls from the scope of the ICRS. The complaint is rejected on that basis.

(Docket 37 at 4.)

Plaintiff asserts that the reviewer of Offender Complaint WCI-2011-9721 was referring to his conditions of confinement claim when he stated that "elements outside of the official hearing record cannot be addressed." According to plaintiff, he felt it was in his best interest to give a brief account and not a detailed description of his issue in the inmate complaints and his failure to use the magic word "conditions of confinement" in the offender complaint would not have resulted in a different outcome.

Despite plaintiff's assertions, the record reveals that he did not file an offender complaint regarding his conditions of confinement claim. There is no indication that administrative remedies were unavailable to him. Thus, plaintiff has failed to exhaust his administrative remedies regarding that claim. *See Schultz v. Pugh*, 728 F.3d 619, 620 (7th Cir. 2013); *see also Pozo*, 286 F.3d at 1025. Therefore,

IT IS ORDERED that plaintiff's motion for summary judgment (Doc. 34) is DENIED.

IT IS FURTHER ORDERED that defendants' motion for summary judgment (Doc. 28) is GRANTED and this action is DISMISSED.

Dated at Milwaukee, Wisconsin, this 7th day of March, 2014.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE